# DIXON STAVE & HEADING CO., Inc. v. JUDSON ARCHER.—291 S. W. (2d) 603.

Eastern Section. March 21, 1956.

Petition for Certiorari denied By Supreme Court, June 8, 1956.

328

Lindsay, Young & Young, and Bolt & Henderson, Knoxville, for plaintiff in error.

Jenkins & Jenkins, Knoxville, for defendant in error.

HOWARD, J. The parties will be referred to as they originally appeared in the trial court.

This appeal is from a judgment in favor of the plaintiff, Judson Archer, who was seriously injured when the

1950 Chevrolet automobile owned and operated by him collided with a truck owned by the defendant, Dixon Stave & Heading Company, Inc., and driven by its employee, Hoover Nicely, on January 7, 1955, at about 5:30 P. M. At the time plaintiff was traveling in a northerly direction toward Maynardsville, Tennessee, where he lived, and the defendant's truck, which was heavily loaded with wooden materials, was traveling toward the City of Knoxville. The accident occurred on U. S. Highway No. 33, in Union County about one mile north of the Knox-Union County Line, at a point approximately 25 feet south of a narrow bridge on said highway where it crosses Suckstone Creek. The weather was clear and the pavement, which was about 19 feet wide, was dry.

It was conceded that the right front of the truck struck the car at or near the right rear fender and wheel, totally demolishing this part of the car. After the impact the two vehicles came to rest on their wrong sides of the highway, the defendant's truck stopping on the east side of the pavement, and the car stopping on the west side with its rear wheels in the ditch and headed east on the shoulder of the road.

In a cross-action the defendant sued Archer for property damages to the truck.

The trial resulted in a jury verdict in favor of Archer for $19,000, and judgment was entered, but no verdict was returned by the jury on said cross-action. After defendant's motion for a new trial was overruled, this appeal was perfected, and errors have been assigned. No question is made on the amount of the verdict or the charge of the court.

The first assignment urges there was no material evidence to support the verdict, and that the verdict is based on inferences wholly inconsistent with the facts; that if the accident happened as indicated by the plaintiff's proof, the damage would necessarily have been to the front instead of the right rear of his car.

■ In ascertaining whether there is any material evidence to support the verdict, we are required to take the strongest legitimate view of all the evidence favorable to th plaintiff, disregard all inferences to the contrary, and indulge all reasonable inferences to uphold the verdict. Jarratt v. Clinton, 34 Tenn. App. 670, 241 S. W. (2d) 941; D. M. Rose & Co. v. Snyder, 185 Tenn. 499, 206 S. W. (2d) 897, 901.

■ After a review of all the evidence presented, and applying the foregoing rule thereto, we find, as did the trial judge, that the verdict is supported by material evidence.

There was a sharp conflict in the evidence as to the speed of the vehicles involved, the distance the truck skidded before the impact, and whether the accident occurred on plaintiff's or defendant's side of the pavement. These conflicts were resolved by the jury in favor of the plaintiff's theory, and under our decisions, the verdict having been approved by the trial judge, we are bound thereby.

According to plaintiff's evidence, another car driven by Robert Smelcher and traveling in the same direction as plaintiff had stopped on the highway about 25 feet south of the narrow bridge crossing Suckstone Creek, waiting for the truck to cross the bridge; that as plaintiff approached the Smelcher car he applied his brakes,

skidded his wheels on the pavement for a considerable distance, and "was stopped" when he saw the approaching truck out of control on the bridge. Describing the accident, plaintiff testified, as follows:

"Q. Now, as you momentarily stopped there, what did you see coming across that bridge? A. A big truck loaded.

"Q. Loaded. What did you notice about the front end of it? A. He come into the bridge, he was bobbing and coming across it, fighting the steering wheel.

"Q. Fighting the steering wheel? A. That's right.

"Q. I will ask you whether or not he was headed directly into you? A. He was.

"Q. What did you try to do to keep from hitting head-on? A. I tried to avoid it by cutting—

"Q. By doing what? A. By cutting to my left.

\* \* \* \* \* \*

"Q. As indicated here by these officers and these markings on this picture, did the accident happen on your side of the road? A. It happened on my side, yes, sir. As I cut to get out of his way, that's all I remember.

"Q. Did you cut to get out of his way? A. Yes, sir.

"Q. What was the next thing you remember? A. Truly, I didn't remember anything until late Sunday night or early Monday morning to remember anybody, to be sure of them.

"Q. *Alright,* do you remember the impact? A. I don't remember him hitting me."

State Highway Patrolman William Majors, who investigated the accident, testified that both vehicles made skidmarks on the pavement, and that the skidmarks made by plaintiff's car were approximately 85 feet in length, were in a straight line, and were well on the plaintiff's side of the highway; that the debris from the impact, consisting of glass, mud, etc., as well as some of the wooden materials from the truck were also on plaintiff's side of the road; that the skidmarks made by the truck, which were about 70 feet in length, started at the bridge and ran south at an angle cross the center of the pavement to where the truck had stopped on plaintiff's side of the highway, and that he did not see anything indicating that the impact occurred elsewhere; that the truck, "to make a long story short,—was on the wrong side completely in that lane."

The Sheriff of Union County, Lee Turner, who arrived before the vehicles were moved, corroborated the testimony of Patrolman Majors as to the location of the debris, etc., as well as the skidmarks, except as to their length, he not having measured them.

It was the defendant's theory, which was not without supporting testimony, that the plaintiff was traveling at a terrifically high rate of speed; that in his attempt to avoid striking the Smelcher car he drove into the pathway of the truck, and that defendant's driver, under these circumstances, could not have avoided the accident.

While the defendant's theory appears to be plausible, it was rejected by the jury, and we cannot say as a matter of law that plaintiff's testimony was entirely with-

out probative force, or that it was a physical impossibility for the accident to have happened in the way described by him. The fact that it is highly improbable that the accident did occur as plaintiff testified it did, does not authorize us to reject his version of the accident. De Rossett v. Malone, 34 Tenn. App. 451, 239 S. W. (2d) 366; Mack v. Hugger Bros. Construction Co., 10 Tenn. App. 402.

In 20 Am. Jur., it says:

"So frequently do unlooked-for results attend the meeting of interacting forces that courts should not indulge in arbitrary deductions from physical law and fact except where they appear to be so clear and irrefutable that no room is left for the entertainment by reasonable minds, of any other." Sec. 1183, p. 1034.

It is a well recognized fact that automobile accidents show strange and inscrutable results, sometimes stranger than fiction. Municipal Paving & Construction Co. v. Hunt, 22 Tenn. App. 380, 123 S. W. (2d) 843; American Tobacco Co. v. Zoller, 6 Tenn. App. 390; 15 Ann. Cas. 1195.

In the instant case there were other circumstances such as the truck's skidmarks, the broken glass, mud, etc., on plaintiff's side of the highway, which supported the plaintiff's theory of the accident. All of these matters, we think, were properly submitted to the jury as circumstantial evidence along with plaintiff's testimony, and having concluded there was material evidence to support the verdict, this assignment is overruled.

The next several assignments of error relate to the manner in which the trial judge conducted the poll of

the jury, which, upon application of either party, is made mandatory by Chapter 239 of the Public Acts of 1955, said Act reading, as follows:

"Section 1. Be it enacted by the General Assembly of the State of Tennessee, That the trial judges in all courts of record in which suits are tried by juries, in both criminal and civil cases, shall be required to poll the jury on application of either the state or the defendant in criminal cases and either the plaintiff or the defendant in civil cases, without exception.

"Section 2. Be it further enacted, That the said juries shall not be polled otherwise than in open court, and in felony cases they shall not be polled unless the defendant is present in open court. In all other cases the respective parties, either the state or the defendant in criminal cases or the plaintiff or the defendant in civil cases, may waive their presence at the time the jury is polled."

The record discloses that when the jury announced its general verdict, a request was seasonably made on behalf of the defendant for a poll of the jury, during which the matters hereinafter complained of occurred.

Under assignment 2 the defendant contends that the jury was improperly polled because the trial judge, instead of calling the names of the last 9 jurors, merely pointed to each and asked, "Is it or not yours?" to which each juror replied, "Yes"; that said answer was ambiguous in view of the form of said question.

To poll the jury means to ascertain by questions to jurors, individually, whether each assents to the verdict,

and under the Act, Chapter 239, the trial judge is "required to poll the jury on application of * * * either the plaintiff or the defendant in civil cases, without exception." However, insofar as we have been able to determine, there is no recognized uniform rule in the method of conducting the poll, and the Act under consideration provides none. Thus, in the absence of such a provision, the method of conducting the poll is entirely within the discretion of the trial judge, whose judgment will not be disturbed, unless it clearly appears that there was an abuse of discretion.

The general rule on the subject of polling the jury is stated in 53 Am. Jur., as follows:

"Examining the jury by the poll is the most generally recognized means of ascertaining whether they are unanimous in their decision. In no other way can the rights of the parties to the concurrence of the jurors be so effectually secured as to have each juror answer the question, 'Is this your verdict?' in the presence of a court and counsel. By this means it can be ascertained for a certainty that no one has been coerced or induced to agree to a verdict to which he does not fully assent. The poll of each member of the jury on the question whether the verdict rendered is the verdict of each juror represents the extent to which the court may go in inquiring of the jurors as to the method of reaching their verdict.

"In polling a jury, each juror must be questioned individually, and it is reversible error for the court, when a poll is demanded, to propound the questions to the twelve jurors collectively instead of individually." Sec. 1015, p. 703.

In the instant case, the general verdict has been announced and three of the jurors had been polled before the trial judge pointed to and asked each of the remaining 9 jurors, without calling their names, ''Is it or not yours?'' Under these circumstances, we think that they fully understood the import of the question, and their answers ''Yes'' indicated this fact, and that the polling, as conducted, met the requirements of the Act.

■■ Nor do we find any merit in defendant's assignment 3 complaining because the trial court failed to poll the jury on the cross-action. The jury not only reported a general verdict for the plaintiff, Archer, but each juror, upon the poll, did likewise, and it was obvious, as between the parties, there could be but one recovery. Besides, under Section 20-1318, T. C. A., Code 1932, sec. 10343, all issues joined are embraced in a general verdict, in the absence of a showing to the contrary. Stewart v. Parker, 33 Tenn. App. 316, 232 S. W. (2d) 57. Moreover, the appellate courts will not reverse a judgment except for error affecting the results of the case. Section 27-116, 27-117, T. C. A., Code 1932, secs. 10653, 10654.

■ Assignment 4 contends that the trial judge should have granted the defendant's motion for a mistrial made after Juror Brown, the second juror polled, stated, ''We figured they both was at fault,'' and also that the trial judge committed error following this juror's statement by asking said juror a series of leading questions, which was not a prerogative of the Court on a poll of the jury.

As disclosed by the record, the jury had reported a general verdict and, at the suggestion of the trial judge, each juror had held up his hand signifying his agreement thereto when the request was made on behalf of the

defendant for a poll of the jury. This request was followed by an exchange of ideas between the trial judge and the opposing attorneys on the proper procedure or method of conducting the poll. This exchange of ideas occurred in the presence of the jury and, terminating in nothing definite, the trial judge, without instructing the jurors as to their duties, proceeded with the polling.

It is apparent that Juror Brown, who had had no previous jury experience, was confused; that he did not know the purpose of a jury poll, or that during the polling a juror stated only his verdict without disclosing his reasons for reaching same, this being indicated by his statement, ''I didn't undertand.'' We think that the following portion of the record clearly shows that the verdict was that of this juror:

''Court: Is that what you decided on? Juror Brown: *Yes.*

''Court: And that is your individual verdict. then. Juror Brown: *Yes.*

''Court: That is your finding in favor of whom. Juror Brown: This man here (pointing).

''Court: Archer? Juror Brown: *Yes.*

''Court: You pointed to Archer. And assess his damages at how much? Juror Brown: $19,000.00.

* * * * * *

''Court: Mr. Brown, tell me whether or not it was your intention for this to be your individual verdict as well as the verdict of the whole Jury that you returned in this case? Juror Brown: *Yes, that was what we decided on.*'' (Emphasis supplied.)

In 89 C. J. S., Trial, it says:

"A verdict is not vitiated by the fact that a juror hesitated to agree to it, or where, in answer to the inquiry, he says it is not his verdict but he consented to it, and subsequently answers that it is his verdict, or says he consented to it under protest, or that he did not believe the verdict right, but agreed to it for the sake of harmony." Sec. 490, p. 152.

 We think that no particular form of answer is essential on the polling of a jury, it being sufficient if the answer of the juror, as here, indicates with reasonable certainty that the verdict is his own.

 As heretofor pointed out, the method of conducting the poll was under the control of the trial judge, whose judgment, in the absence of abuse of discretion, is not reviewable by the appellate courts. Under the circumstances, it was the duty of the trial judge, whose approval was necessary for a valid judgment, to ascertain if the verdict returned was that of each individual juror, and the asking by the trial judge of leading questions to obtain this fact was not reversible error.

 Assignment 5 complains because the trial judge, during the polling of the jury, refused to permit Juror Hill to address the Court after inquiring if he could "say something"; that Juror Hill, as shown by his affidavit, would have informed the Court that the jury disregarded negligence and fault on arriving at its verdict.

As the record discloses, Juror Hill stated upon two occasions during the poll of the jury, once before his request was refused and the other immediately thereafter, that the verdict was his individual verdict, and nothing appears to the contrary.

340

■ We think that the juror's request was properly refused. The object of polling the jury is for the purpose of ascertaining for a certainty the individual juror's verdict. It is not to determine the mode in which they arrived at the verdict. In 89 C. J. S., Trial, it says:

"The mere fact that a juror tried to address the court, after he had assented to the verdict when polled, and the jury discharged, it not appearing that the juror wanted to attack the verdict, is not ground for a new trial." Sec. 487, p. 145.

■ No rule is better or more uniformly established than that a juror will not be permitted to impeach his verdict by later making affidavit, the substance of which shows he did not fairly try the case as he had taken oath to do. Waller v. Skeleton, 31 Tenn. App. 103, 212 S. W. (2d) 690; Lee v. State, 121 Tenn. 521, 116 S. W. 881, 890.

In Lee v. State, supra, the Court said:

" '* * * but it is insisted that the facts disclosed in this affidavit show that the jury did not arrive at their verdict by a correct process of reasoning, that they resorted to facts not proper to be considered, and upon principles not applicable to the case, and that for this reason a new trial should be granted. If this rule were adopted, but few verdicts would be permitted to stand. Jurors may arrive at the same conclusion, and render the same verdict, but the influences that control their minds, and the process of reasoning by which they arrive at their conclusion, are as diverse as the human mind itself; and the argument and reasons governing each juror in rendering his verdict might not always be found the most logical, or in accordance with the views of the court. If no error of law was committed, if the jury

were guilty of no misconduct, *if the verdict they render is supported by the evidence, this court could not set it aside upon the affidavit of a juror that he reached his result by erroneous reasoning, or from considerations that should not have influenced him, but will presume that the result arrived at was the legitimate result of the law and the facts.'*

"We think the affiidavit in the present case falls within the last line of authorities, as the substance of these cases is expressed in the opinion just quoted from. The affidavit undertook to state merely the method by which the jury arrived at their conclusion, or the reason upon which they reached the result. The reason given, it is true, was an erroneous one, and involved a matter which they had no right to consider; *but within the rule as above laid down, when the court can see that the verdict is sustained by the evidence which was submitted to the jury, and that it is in accordance with the law,* we cannot reverse because the jury reached the true result on erroneous ground and entertained considerations which they had no right to indulge." (Emphasis supplied.)

 Finally, for reasons stated in Lee v. State, supra, we find no merit in the defendant's contention that the trial court erred in refusing to order the jurors into court for questioning, based on Juror Hill's affidavit that the jury disregarded negligence and fault in arriving at its verdict.

Accordingly, all assignments of error will be overruled, and the judgment below will be affirmed at defendant's costs.

McAmis, P. J., (Eastern Section) and Hale, J., concur.